**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ATP OIL & GAS CORPORATION,** | § | **CASE NO. 12-36187-H1-11** |
| | § | **(CHAPTER 11)** |
| **DEBTOR.** | § | |
| | § | |
| | § | |
| **BENNU OIL & GAS, LLC** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. _____** |
| | § | |
| **BLUEWATER INDUSTRIES L.P. and** | § | |
| **TECHNIP USA, INC.** | § | |
| | § | |
| **DEFENDANTS.** | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Bennu Oil and Gas, LLC, ("Bennu"), the purchaser of certain assets of ATP Oil & Gas Corporation ("ATP" or "Debtor"), files this Original Complaint against Bluewater Industries L.P. ("BWI") and Technip USA, Inc. ("Technip") for damages and to determine the amount, if any, of Senior Liens (as defined below) held by the defendants. In support thereof, Bennu respectfully states as follows:

**PARTIES**

1.      Bennu is a Delaware limited liability company with a principal address at 4600 Post Oak Place, Suite 100, Houston, Texas 77027.

2.      BWI is a Limited Partnership formed under the laws of the state of Texas. BWI filed Proof of Claim No. 433 on January 30, 2013. BWI may be served via first class U.S. mail,

postage prepaid, sent to the attention of James Woodward, BWI, 5300 Memorial Drive, Suite 550, Houston, Texas 77007, with a copy sent to BWI's attorney Elizabeth Guffy, Burleson LLP, 700 Milam Street, Suite 1100, Houston, Texas 77002.

3.      Technip is a corporation incorporated under the laws of the state of Delaware. Technip filed Proof of Claim No. 586 on August 27, 2013. Technip may be served via first class U.S. mail, postage prepaid, sent to Technip's agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3616, with a copy sent to Technip's counsel Mark A. Mintz, Jones Walker LLP, 201 St. Charles Avenue, 49th Floor, New Orleans, Louisiana 70170.

<strong>JURISDICTION AND VENUE</strong>

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C), (K), (M) and (O).  Pursuant to Local Rule 7008-1, Bennu does consent to entry of final orders or judgment by the Bankruptcy Court if it is determined that a bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U. S. Constitution.

5.      Venue for this adversary proceeding is proper in this Court under 28 U.S.C. § 1408.

6.      This adversary proceeding is also a proceeding for the determination of the validity and amount of asserted Senior Liens, as that term is defined in the Final Order (A) Approving the Sale of Certain of the Debtor's Assets Free and Clear of Claims and Liens and (B) Approving the Assumption and Assignment of Contracts and Leases [Docket No. 2706] (the "Final Sale Order").  Paragraph 5 of the Final Sale Order reads, in pertinent part, as follows:

> This Court shall have exclusive jurisdiction over any dispute as to the amount and priority of any Senior Lien and the Senior Lien Escrow until

the Senior Lien Escrow is exhausted; and any such dispute shall be resolved by adversary proceeding unless Purchaser [Bennu] and the holder of such Senior Lien agree otherwise.

Final Sale Order ¶ 5.

## FACTUAL ALLEGATIONS

**The Parties**

7.      Bennu is an offshore exploration and production company that is engaged in the acquisition, development and production of natural gas and oil properties in the Gulf of Mexico. As discussed in more detail below, Bennu acquired all or substantially all of its current assets from ATP.

8.      ATP is an offshore exploration and production company that, prior to the sale of its assets to Bennu, was engaged in the acquisition, development and production of natural gas and oil properties in the Mediterranean Sea, the Gulf of Mexico and the North Sea.

9.      On information and belief, BWI purports to be a general marine contractor specializing in turnkey field development projects for all aspects of design, engineering, contracting, construction and installation of offshore oil and gas platforms, facilities, pipelines and other infrastructure in the Gulf of Mexico and the North Sea.[1]

10.      On information and belief, Technip performs project management, engineering and construction services for the energy industry.  In connection with its subsea and offshore services, Technip operates a fleet of 27 subsea pipelay and subsea construction vessels.[2]

**The MSA & ARMSA**

11.      On February 1, 2008, ATP and BWI entered into a Master Service Agreement (the "MSA") which was to govern the relationship between the parties for any project on which

---

[1] http://www.bluewaterindustries.com
[2] http://www.technip.com/en/about-us/company-profile/technip-glance

ATP and BWI agreed to work together.  A true and correct copy of the MSA is attached hereto as Exhibit A.

12.     On September 11, 2009, ATP and BWI entered into an Amended & Restated Master Service Agreement (the "ARMSA").  The ARMSA governs any project that ATP requests BWI to perform and that BWI agrees to undertake during the term of the ARMSA, which is one year from the date of the agreement and from month-to-month thereafter unless terminated.  A true and correct copy of the ARMSA is attached hereto as Exhibit B.

13.     Section 2.1 of the MSA and ARMSA contemplates that ATP and BWI will agree upon specific "Work Orders" that will govern the "Work" (as those terms are defined therein) that BWI is to perform on any given project pursuant to the terms of the MSA and ARMSA.

14.     Section 3 of the MSA and the ARMSA provides that any change to the Work that resulted in an adjustment in BWI's compensation had to be expressly set forth in a Change Order and agreed to by ATP in writing.  Pursuant to Section 7.3 of the MSA and ARMSA, BWI is not entitled to receive payment for any changes to the Work for which a Change Order is not executed, unless such work constitutes "Extra Work" as defined therein.

15.     Under Section 4 of the MSA and the ARMSA, BWI agreed to "furnish all Equipment, Goods and facilities required to accomplish the Work within the times specified in this Agreement or in the Applicable Work Order."

16.     BWI further agreed that "[a]ll Equipment, Goods and facilities shall be serviceable, fit for their intended purposes and kept in first-class operating condition" and "shall be new and of the type specified in the Specifications."  If any of the Equipment or Goods were "defective or unsuitable," BWI agreed that the "defective or unsuitable Equipment or Goods

shall be removed, replaced, or corrected, as applicable, by [BWI] without additional cost or risk to [ATP]."  MSA & ARMSA Section 4.

17.     Under Section 5.3 of the MSA and ARMSA, BWI was required to "prosecute the Work safely and with due diligence, in a Workmanlike Manner, using qualified, experienced, competent and efficient workers and supervisors, and properly designed and tested Equipment, and in accordance with good oil field practices and strict conformity with the provisions of this Agreement, any applicable Work Order, and all applicable Laws and Regulations."

18.     Under Section 5.6 of the MSA and ARMSA, BWI was required to "keep on the job competent superintendent(s) who will be in charge of the Work."

19.     In addition, in Section 5.7.2 of the MSA and the ARMSA, BWI was further required "at its sole cost and expense . . . to forthwith remove and replace, or otherwise correct, to the satisfaction of [ATP], any portion of the Work that is determined, by inspection or otherwise, to be unsound or defective . . . and any damage to any portion of the Work resulting from such removing, replacing and/or correcting."

20.     Under Section 6 of the MSA and ARMSA, BWI provided warranties to ATP with regard to Engineering and Design Services and Workmanship, Materials, Equipment, Goods, Services and Personnel.  In accordance with Section 6.1, BWI warranted that its "Design Services shall (a) be performed with the generally accepted standards and practices prevailing in the engineering industry by individuals qualified in those specific technical areas, and (b) comply with the drawings and Specifications."  If any of BWI's Design Services "fail to comply with the foregoing warranty, [BWI] shall reperform, without any additional charge, all or any portion of those Design Services originally performed in an improper, defective or negligent manner by [BWI]."  In accordance with Section 6.2, BWI represented and warranted that "(a) it will

perform all Services hereunder in a Workmanlike Manner . . . ; and (b) all purchased products, Goods, Equipment, and materials shall be new . . . shall meet Specifications, shall be free from defects in design, workmanship and materials, and shall comply with all applicable Laws and Regulations . . . ."

21.     Under Section 13.3 of the MSA and the ARMSA, to the maximum extent permitted by law, BWI agreed to "waive any and all right to lien the Work and the real property upon which the Work is located and any hydrocarbon product associated with the Work."  BWI further agreed to "take all action reasonably necessary to avoid attachment of a lien on [ATP] property by any of [BWI]'s Subcontractors and to remove any such lien on [ATP] property that arises from or in connection with the Work."  In conjunction with this provision, BWI indemnified and committed to defend and hold ATP harmless from all costs, damages, losses or liabilities arising from such liens.  This provision also provides that, to the extent that ATP (or in this case its successor Bennu) pays to remove any lien claims from the project, it may deduct the amounts paid from any amounts due to BWI.

22.     BWI further agreed, in Section 15.1 of the MSA and ARMSA, that it would be "fully responsible" for any work of its Subcontractors and no subcontract shall relieve BWI from its obligations under the MSA or ARMSA.  BWI also agreed to incorporate the terms and conditions of the MSA and/or the ARMSA and the applicable Work Order into each subcontract.

**The Clipper Project**

23.     On or about May 30, 2008, Davis Offshore, L.P. and Stephens Production Company LLC assigned an interest in Green Canyon Blocks 299 and 300 (the "Clipper Project") to ATP.  On or about November 16, 2011, Davis Offshore, L.P. and Stephens Production

Company LLC assigned the remainder of their interests in the Clipper Project to ATP, thus making ATP the sole owner and operator of the Clipper Project.[3]

24.     The development plan for the Clipper Project called for it to be developed as a "sub-sea tieback."  A sub-sea tieback is a method of completing a well where the wellhead is located on the sea floor and a pipeline and control umbilical are laid from the well head to a nearby production platform for the purpose of extracting oil and gas.  The platform selected for the Clipper Project was the "Front Runner" platform spar operated by Murphy Exploration & Production Company and located on Green Canyon Block 338, which is approximately 16 miles from the Clipper Project wellhead.

25.     On April 1, 2009, ATP and BWI entered into work order No. MSA-08-027-010 ("Work Order I") for the Clipper Project.  Under Work Order I, BWI agreed to "complete all work and furnish all equipment, vessels, tools, materials, supplies and personnel necessary and incidental to the following work activities in connection with [ATP's] Clipper Field subsea development in Green Canyon blocks 299/300: . . . (3) Pipeline/umbilical design, fabrication and installation including flexible production riser . . ."  BWI further agreed that its "Work" on the Project was to be governed by Work Order I and the MSA.  Work Order I authorized BWI to proceed with performance of the Work and to bill ATP for such Work on a cost plus basis in an amount not to exceed $35,000,000.  A true and correct copy of Work Order I is attached hereto as Exhibit C.

26.     On February 1, 2012, ATP and BWI entered into work order No. MSA-08-027A-007 ("Work Order II" and collectively with the MSA, ARMSA and Work Order I the "BWI Agreements") for the Clipper Project.  Under Work Order II, BWI agreed to, among other things "complete all work and furnish all equipment, vessels, tools, materials, supplies and personnel

---

[3] This paragraph is made on information and belief.

necessary and incidental to the engineering, procurement, installation and commissioning for the subsea development pipelines, 'Front Runner' topsides modifications, production risers and subsea well control system.  BWI also agreed to provide "project management and coordination" and "inspection for quality assurance and quality control."  BWI further agreed that its "Work" on the Project was to be governed by Work Order II, the scope of work attached to Work Order II (the "Scope of Work") and the ARMSA.   Under Work Order II, BWI was to be paid a lump sum of $123,019,878 for work that included providing and installing an "electro-hydraulic umbilical" to the floating production platform located in Green Canyon Block 338 (the "Umbilical").  A true and correct copy of Work Order II is attached hereto as Exhibit D.

27.     Pursuant to the Scope of Work, BWI stated that the anticipated completion date for its work on the Clipper Project was October 1, 2012.

28.     In connection with the construction of the Clipper Project, BWI entered into subcontracts for performance of specific work.   On March 31, 2009, BWI entered into a subcontract agreement with Technip (the "Technip Subcontract") under which Technip agreed to perform certain components of the Clipper Project, including installation of the Umbilical.

29.     On August 22, 2011, BWI executed a Purchase Order with Parker Hannifin Corp ("Parker") for design and manufacture of the Umbilical (the "Parker Subcontract

30.     Both the Technip Subcontract and the Parker Subcontract contained warranties related to the Umbilical.  Under the terms of the Technip Subcontract, Technip warranted to BWI that its work on the Clipper Project would meet project specifications and would be free from defects.  Technip further agreed that it would repair or rectify defective work for a period of between 12 months following practical completion to 18 months following actual completion, depending on the type of work found to be defective.

31.     In the Parker Subcontract, Parker warranted all items sold against defects for the warranty period for a period of either 12 months from installation or 18 months from delivery as long as (a) notice of the defect was reported by BWI to Parker in writing within the warranty period and within seven days of discovery; (b) the defect prevents the items from being fit for use for their intended purpose; (c) the items were handled, transported, stored and maintained in accordance with Parker's recommendations and installed in accordance with Parker's approved installation procedure; and (d) the items were used within the conditions, environment and pressure range for which they were designed and manufactured.

32.     Neither the Technip Subcontract nor the Parker Subcontract incorporated the terms and conditions of the BWI Agreements, as expressly required by the MSA and the ARMSA.

33.     Under the terms of the MSA, ARMSA, and Work Orders I and II and in conjunction with the Technip Subcontract and the Parker Subcontract, BWI was responsible for the design, manufacturing and installation of the Umbilical at the Clipper Project.

**ATP's Bankruptcy**

34.     On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  This bankruptcy filing occurred during construction of the Clipper Project.  From the outset of the case, the Debtor emphasized that the Clipper Project was essential to the Debtor's reorganization plan, that the Clipper Project was the Debtor's best, perhaps only, chance for successful reorganization and that any delay in completion of the

Clipper Project "would be devastating to ATP and its prospect for reorganization." [Docket No. 28, ¶¶ 30, 74 and 75] (Declaration of Albert L. Reese, Jr. in Support of First Day Pleadings)[4]

35.     Because of their connection to the Clipper Project, BWI and Technip received extraordinary protections and preferential treatment from the Debtor in the bankruptcy case. Both BWI and Technip were treated as "critical vendors" under the Order Authorizing Certain Critical Vendor Payments [Docket No. 305].  As such and on a preferential basis to other pre-petition creditors, BWI was authorized to be paid $14,932,644.11 of its pre-petition claim [Docket Nos. 356, 555, 861, and 1091], and Technip was authorized to be paid $12,384,948.84 of its pre-petition claim [Docket Nos. 356 and 357].[5]  In total, BWI received payments from ATP, in the post-bankruptcy period alone, of approximately $24 million in relation to the Clipper Project, this despite the fact that BWI itself performed no material design, engineering or construction services and subcontracted out all of the work on the project.

36.     Notwithstanding the extremely preferential treatment provided to BWI and Technip, they were unable to complete the Clipper Project within the budgeted cost or on the required schedule.  Due, in part, to delays in completion of the Clipper Project by BWI and Technip, the completion date for the Clipper Project consistently moved through the fall and winter of 2012-2013 until it was finally set as an Event of Default under the Debtor's post-petition loan as March 1, 2013 [Docket No. 986, p. 13], although even that date had to be moved to March 3, 2013 [Docket No. 1489-1, Sched. 8.22].  Production from the Clipper well #5 (the

---

[4] The Debtor's representatives also repeatedly emphasized the critical importance of the timely completion of the Clipper Project at the first day hearing held August 21, 2012. *See* August 21, 2012 transcript pp. 16, 20–22, 27, 30, 62–63, 114– 115, 117, 119 and 269.

[5] Parker, who manufactured and supplied the defective umbilical, was also paid $10,188,040 of its pre-petition claim as a critical vendor.  [Docket Nos. 555 and 691].  Upon information and belief, both Technip and Parker have been paid in full for their pre-petition claim, unlike the vast majority of other creditors in this case including other vendors on the Clipper Project.

"Clipper Oil Well") was finally achieved on March 15, 2013, six and a half months after the anticipated completion date of October 1, 2012 contained in Work Order II.

37.     Similarly, the Debtor originally projected May 1, 2013 for completion of Clipper well #2 (the "Clipper Gas Well") [Docket No. 1489-1, Sched. 8.22].  This date also consistently moved later through the spring and summer of 2013.  Production from the Clipper Gas Well was finally achieved on October 11, 2013, more than five months after the original projected completion date.

38.     Likewise, the Clipper Project was significantly over budget.  As of August 28, 2012 - shortly after the Debtor's bankruptcy filing - the Debtor projected the cost to complete the Clipper Project to be approximately $120 million.   Although still being fully determined,  taking into consideration the total amount of the asserted claims by BWI and Technip,  the total cost of the Clipper Project would be in excess of $200 million (not including amounts described below that are being incurred as a result of the failed Umbilical).

### **The Failed Umbilical**

39.     As noted above, the Clipper Oil Well was brought on line approximately March 15, 2013.  Only approximately three (3) weeks after first oil production, the Umbilical lost electrical connectivity.   At that point, the well could only be shut in using hydraulic controls, which cannot be used to restart or monitor the well.  The Umbilical is not repairable and needs to be replaced for efficient operation of the well.

40.     Both ATP and Bennu provided notice to BWI of the failed Umbilical and requested that BWI honor its contractual obligations, including its warranty responsibilities, by repairing and/or replacing the defective Umbilical.  Despite repeated demands, BWI has refused to repair and/or replace the failed Umbilical it provided and installed at the Clipper Project.  In

fact, BWI has disavowed its warranty and has argued under various theories that it is not bound by the contractual warranty it provided the Debtor.

41.     As a direct result of the failed Umbilical, ATP originally, and now Bennu, maintained a vessel and associated equipment and personnel at the Clipper well site with a secondary umbilical attached to the well at a cost of greater than $100,000 per day.  Bennu was required to maintain such vessel and its associated equipment and personnel at the Clipper Project in order to operate the Clipper Gas Well in accordance with applicable laws until the defective Umbilical can be repaired and/or replaced.  Bennu has recently determined, in part due to the excessive costs of maintaining such vessel and its associated equipment and personnel at the Clipper Project, that the defective Umbilical requires the gathering line and the Clipper Gas Well to be shut-in until the Umbilical is replaced.

42.     Bennu has also begun the process of replacing the Umbilical at its own expense. The anticipated cost to replace the Umbilical is approximately $13 million (in excess of any daily expenses incurred for maintenance of the secondary umbilical) although the full cost will not be known until the work is completed.

**Purchase of the Clipper Project by Bennu**

43.     During the bankruptcy case, ATP filed motions to sell all or substantially all of its assets.  On October 17, 2013, the Bankruptcy Court entered the Final Sale Order approving the sale of certain of the Debtor's assets, including the Clipper Project (collectively the "Purchased Assets"), to Bennu pursuant to an Asset Purchase Agreement (the "APA").  *See* Final Sale Order, ¶ N; APA, § 3.01.

44.     Pursuant to the Final Sale Order, Bennu acquired the Purchased Assets subject to the Senior Liens, which, as defined in the Final Sale Order, are the legitimate liens on the

Purchased Assets that rank senior in priority to the liens securing the claims of ATP's debtor-in-possession lenders. *See* Final Sale Order, ¶ N.  Senior Liens must be satisfied first out of the Senior Lien Escrow (as defined in the Final Sale Order), and any Excess Senior Liens (as defined in the Final Sale Order) shall continue to attach to the Purchased Assets. *See* Final Sale Order, ¶ 5.  Bennu retains a residual interest in any amounts remaining in the Senior Lien Escrow after payment of all Senior Liens. *Id.*

45.     Under 2.02(o) of the APA, Bennu also acquired "all Claims, ORRI/NPI Claims, counterclaims, and rights of offset, whether asserted or unasserted, contingent or fixed, known or unknown, including any warranty or damage Claims …."

46.     In accordance with the APA, Bennu was also assigned the ARMSA and any and all contracts between ATP and BWI related to the Clipper Project, including Work Order I and Work Order II.  Pursuant to the Final Sale Order, Bennu is required to pay any Cure Amounts, as defined in the Final Sale Order, with respect to assumed contracts.  Final Sale Order ¶ 40.

**<u>The Liens</u>**

47.     On July 8 and July 9, 2013, in violation of the MSA and ARMSA, BWI filed liens under the Louisiana Oil Well Lien Act ("LOWLA") in the amount of $17,249,352.40 in Plaquemines Parish, Lafourche Parish, and Terrebonne Parish, Louisiana (the "BWI Liens") for amounts allegedly due BWI in connection with the Clipper Project. The BWI Liens purport to encumber the Clipper Project and, if valid, would constitute Senior Liens under the Sale Order.

48.     The BWI Liens are invalid given the provisions of the MSA and ARMSA.

49.     Additionally, on information and belief, the amount asserted in the BWI Liens is overstated because, among other things, it (a) includes amounts for work not performed or amounts which BWI is not entitled to recover under the BWI Agreements, including amounts

outside of the fixed price portion of Work Order II that are not the subject of agreed upon Change Orders; (b) includes amounts for work charged on a cost plus basis that should have been included as part of the fixed price portion of the BWI Agreements; and (c) does not take into account any offsets or counterclaims that are available to Bennu under the BWI Agreements and applicable law, including, without limitation, (i) claims arising from the warranty provided in the MSA and ARMSA; (ii) claims based upon other breaches by BWI of the BWI Agreements; and (iii) the offset of amounts paid directly to BWI subcontractors by ATP or Bennu against amounts allegedly due to BWI.

50.     On October 10, 2013, contrary to the terms of the ARMSA,  Technip filed a lien under LOWLA in Lafourche Parish, Louisiana, in the amount of $21,772,456.09 (the "Technip Lien") for amounts allegedly due Technip in connection with the Clipper Project. The Technip Lien purports to encumber the Clipper Project, and, if valid, would constitute a Senior Lien under the Sale Order.

51.     The Technip Liens are invalid given the provisions of the MSA and ARMSA.

52.     Additionally, on information and belief, the amount asserted in the Technip Lien is overstated because, among other things, it (a) includes charges for amounts already paid to Technip (b) includes amounts that Technip is not due under the applicable agreements with ATP and BWI, including, but not limited to, amounts for additional work over and above the fixed price portion of the BWI Agreements that were not the subject of agreed upon, written Change Orders; and (c) does not take into account any offsets or counterclaims that may be asserted by Bennu in connection with the calculation of Technip's lien under applicable law, including claims arising from the issues concerning the Umbilical.

53.     Additional BWI subcontractors also have or may assert liens with respect to the Clipper Project.  Despite its obligations under the MSA and ARMSA, BWI has neither defended Bennu against these liens nor does it intend to indemnify Bennu with respect thereto.  To the contrary, in a letter dated November 20, 2013 from James A. Woodward, Vice President of BWI, to various BWI subcontractors, BWI instructed its subcontractors to bill Bennu directly and suggested that they "explore the assertion of lien rights against the Clipper property" in the event that they have unpaid claims for work on the Clipper project.  A true and correct copy of this November 20, 2013 letter is attached hereto as Exhibit E.

### COUNT I – BREACH OF CONTRACT AS TO DEFENDANT BWI

54.     Plaintiff repeats and restates the allegations set forth in the foregoing paragraphs of this Complaint as if set forth fully herein.

55.     BWI is a party to certain contracts with ATP that were assumed by Bennu, including the MSA, ARMSA, Work Order I and Work Order II.

56.     As a result of the conduct set forth herein, BWI has breached the BWI Agreements - to which Bennu is now a party.  BWI's numerous breaches of these agreements include, but are not limited to, the following:

    (a)    BWI's failure to perform its work at the Clipper Project in a Workmanlike Manner and its failure to provide materials that are free from defects in design and/or workmanship, including, but not limited to, its failure to provide and install a serviceable, defect-free Umbilical that was kept in first-class operating condition;

    (b)    BWI's failure to remove, replace or correct the unsuitable and defective Umbilical;

(c)     BWI's failure to adequately provide project management, coordination and inspection services to the Clipper Project as required in the BWI Agreements;

(d)     BWI's failure to submit Change Orders for approval by ATP covering additional costs and other charges that BWI is seeking to recover;

(e)     BWI's failure to incorporate the terms of the MSA, ARMSA and Work Orders I and II into the terms of contracts with its subcontractors, including the Technip Subcontract and the Parker Subcontract;

(f)     BWI's filing of the BWI Lien on the Clipper Project;

(g)     BWI's assertion, in connection with the BWI Liens, that it is owed amounts in excess of what is contractually owed to BWI;

(h)     the failure of BWI to remove the liens of its subcontractors, including the Technip Lien, from the Clipper Project and BWI's active encouragement of its subcontractors to file liens on the Clipper Project;

(i)     BWI's failure to defend and indemnify Bennu from liens filed by its subcontractors, including but not limited to Technip.

57.     BWI's breaches of the MSA and ARMSA have directly damaged Bennu and ATP (Bennu's predecessor under the BWI Agreements), in an amount to be determined at trial, including but not limited to, (a) expenses and damages associated with delay and increased cost of the Clipper Project that were a result of BWI's breaches of the BWI Agreements, (b) expenses and damage suffered as the result of the failed Umbilical, including, but not limited to (i) the costs to position a ship to provide a secondary umbilical, (ii) remediation expenses, which are expected to total in excess of $13 million, for manufacture and installation of a new, functional and defect-free umbilical at the Clipper Project and (iii) lost revenue as the result of the failed

Umbilical; (c) expenses and damage suffered by Bennu as the result of liens placed on the Clipper Project by BWI or its subcontractors, including the cost to defend against such liens and/or satisfy the liens of subcontractors (including, but not limited to, the costs associated with this lawsuit).

COUNT II – BREACH OF WARRANTY AS TO DEFENDANT BWI

58.     The foregoing paragraphs are hereby incorporated as if fully set forth herein.

59.     BWI's failure to provide and install an Umbilical free from defects in design, workmanship and materials at the Clipper Project constitutes a breach of the express warranty provided by BWI in Section 6 of the MSA and the ARMSA.   In addition, BWI's failure to provide design services for the Umbilical in accordance with generally accepted engineering industry standards and practices is a further breach of the express warranty provided by BWI in Section 6 of the MSA and the ARMSA.

60.     BWI's failure to comply with the express warranties provided in the MSA and ARMSA are the direct and proximate cause of damages to Bennu.   Due to BWI's breaches of warranty Bennu has, and will continue to suffer direct damages, including but not limited to, (i) expenses to position a ship and associated equipment and personnel at the Clipper Project to provide a secondary umbilical, (ii) remediation expenses expected to total in excess of $13 million for manufacture and installation of a new, defect-free umbilical at the Clipper Project, and (iii) lost revenue as a result of the failed Umbilical.

61.     Through this action, Bennu seeks recovery of all damages incurred as a result of said warranty breaches.

COUNT III – DECLARATORY JUDGMENT AS TO DEFENDANT BWI

62.     The foregoing paragraphs are hereby incorporated as if fully set forth herein.

63.     28 U.S.C. § 2201 provides, in pertinent part, that:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon a filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

64.     Pursuant to 28 U.S.C. § 2201 and 11 U.S.C. § 105(a), this Court has the power to declare and adjudicate the rights and obligations of the parties hereto and to grant such other and further relief as may be necessary to enforce the rights and obligations pursuant to the applicable contracts and the Final Sale Order.

65.     A substantial and actual controversy exists between the Plaintiff and BWI as to: (a) whether BWI has the right to assert liens on the Clipper well; and (b) if BWI can assert such liens, the amount, if any, of any Senior Liens held by BWI taking into account all applicable offsets, credits, counterclaims and other reductions, including, but not limited to, the matters described in this Complaint.

66.     Bennu seeks an order from this Court:

(a)     (i) declaring that the BWI Lien is invalid because BWI waived its right to file liens on the Clipper Project; or (ii) declaring, pursuant to the Final Sale Order, the amount, if any, of any Senior Liens held by BWI taking into account all applicable offsets, credits, counterclaims and other reductions, including, but not limited to, the matters described in this Complaint; and

(b)     declaring that the Cure Amount (as defined in the Final Sale Order) with respect to the MSA, ARMSA, Work Order I and Work Order II is equal to the amount, if any, of BWI's Senior Liens, taking into account all applicable offsets, credits,

counterclaims and other reductions, including, but not limited to, the matters described in this Complaint.

### COUNT IV – DECLARATORY JUDGMENT AS TO DEFENDANT TECHNIP

67.     The foregoing paragraphs are hereby incorporated as if fully set forth herein.

68.     28 U.S.C. § 2201 provides, in pertinent part, that:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon a filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

69.     Pursuant to 28 U.S.C. § 2201 and 11 U.S.C. § 105(a), this Court has the power to declare and adjudicate the rights and obligations of the parties hereto and to grant such other and further relief as may be necessary to enforce the rights and obligations pursuant to the applicable contracts and the Final Sale Order.

70.     A substantial and actual controversy exists between the Plaintiff and Technip as to: (a) whether Technip has the right to assert liens on the Clipper well; and (b) if Technip can assert such liens, the amount, if any, of any Senior Liens held by Technip taking into account all applicable offsets, credits, counterclaims and other reductions, including, but not limited to, the matters described in this Complaint.

71.     Bennu seeks an order from this Court:

(a)     declaring that the Technip Lien is invalid because BWI waived its right, and the right of its subcontractors, to file liens on the Clipper Project; or

(b)     declaring, pursuant to the Final Sale Order, the amount, if any, of any Senior Liens held by Technip taking into account all applicable offsets, credits,

counterclaims and other reductions, including, but not limited to, the matters described in this Complaint.

### COUNT V – ATTORNEYS' FEES

72.     The foregoing paragraphs are hereby incorporated as if fully set forth herein.

73.     Bennu has been forced to incur attorneys' fees and additional expenses by way of the foregoing.   Pursuant to 28 U.S.C. § 2202, Bennu seeks to recover its reasonable and necessary attorneys' fees and costs incurred herein.

### PRAYER

Wherefore, Bennu respectfully requests that this matter be set for trial, and that, after final hearing, judgment be entered against Defendants and in favor of Plaintiff for the following relief:

(1)     all damages incurred and/or caused by BWI's breaches of contract and breaches of warranty;

(2)     declaratory relief as requested herein;

(3)     reasonable and necessary attorneys' fees incurred herein;

(4)     costs of court and other recoverable expenses;

(5)     pre-judgment and post-judgment interest; and

(6)     such other relief to which Bennu may be justly entitled.

**DATED: January 3, 2014**

Respectfully submitted,

**BINGHAM MCCUTCHEN LLP**
Ronald J. Silverman
(*pro hac vice* admission pending)
Andrew J. Gallo
(*pro hac vice* admission pending)
399 Park Avenue
New York, New York 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378

-AND-

**WINSTEAD PC**

By: ____/s/ Phillip L. Lamberson____
   Phillip L. Lamberson – SBT No. 00794134
   R. Michael Farquhar – SBT No. 06828500
   (*pro hac vice* admission pending)
   Michelle I. Rieger – SBT No. 02149490
   S.D. Tex. No. 11236
   Kristen L. Sherwin – SBT No. 24043918
   S.D. Tex. No. 1066009
   500 Winstead Building
   2728 N. Harwood Street
   Dallas, Texas 75270
   Telephone: (214) 745-5400
   Facsimile: (214) 745-5390

**ATTORNEYS FOR BENNU OIL & GAS, LLC**