

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**09/18/2014**

| | | |
|---|---|---|
| IN RE: | § | |
| **ATP OIL & GAS CORPORATION** | § | **CASE NO: 12-36187** |
| Debtor(s) | § | |
| | § | **CHAPTER  7** |
| | § | |
| **BENNU OIL & GAS, LLC** | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 14-03001** |
| | § | |
| **BLUEWATER INDUSTRIES, L.P.,** *et al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION

Bluewater Industries, L.P.'s motion for partial summary judgment is granted in part and denied in part.  (ECF No. 47).

### Procedural Background

On January 3, 2014, Bennu Oil and Gas, LLC filed an Original Complaint against Bluewater Industries L.P. and Technip USA, Inc. relating to defendants' contract work performed on the Clipper Project.  (Case No. 14-3001, ECF No. 1).

On March 25, 2014, Bluewater filed a motion for partial summary judgment. (ECF No. 47).  On April 15, 2014, Bennu filed an opposition to Bluewater's motion.  (ECF No. 59).  On April 23, 2014, Bluewater filed a reply in support of its motion for partial summary judgment. (ECF No. 60).

### Facts

ATP Oil & Gas Corporation hired Bluewater as the general contractor on ATP's Clipper Pipeline Project in the Gulf of Mexico.  Prior to any work, Bluewater and ATP entered into

several agreements, including an Amended and Restated Master Service Agreement ("ARMSA") and a work order ("Work Order II") issued on or about February 1, 2012. Under Work Order II, Bluewater was required to "design, engineer, fabricate, and/or procure, load out, transport, field erect, tie in and test" certain "well control system components." (ECF No. 47-4 at 1). As part of the agreement, Bluewater was responsible for providing and installing an "electro-hydraulic umbilical" to the floating production platform located in Green Canyon Block 338.

In connection with the construction of the Clipper Project, Bluewater entered into several subcontracts for performance of specific work. On March 31, 2009, Bluewater entered into a subcontract agreement with Technip under which Technip agreed to perform certain obligations related to the Clipper Project, including installation of the umbilical.

The ARMSA expressly waived ATP and Bluewater's rights to assert claims against each other for "consequential, special or indirect damages:"

**21. Consequential Damages**

    **21.1 Mutual Waiver:**

    [ATP] and [Bluewater] waive and release any claims against the other for consequential, special or indirect damages incurred by them (except those arising out of or in connection with pollution which are governed by Paragraph 8.5; or those which result from gross negligence, willful misconduct or intentional act of [ATP] or [Bluewater]), however and whenever arising under this [ARMSA] or as result of or in connection with the Work or Services, and whether based on negligence, unseaworthiness, breach of warranty, breach of contract, strict liability or other;

    **21.2 Definition:**

    Consequential damages shall include, but not be limited to, loss of revenue, profit or use of capital, production delays, loss of product, reservoir loss or damage, losses resulting from failure to meet other contractual commitments or deadlines and downtime of facilities or vessels. Consequential damages shall not include any liability imposed pursuant to the Oil Pollution Act of 1990, as it may be amended from time to time.

(Case No. 14-3001, ECF No. 47-1 at 2-3).

On October 14, 2013, ATP filed a notice of intent to assume and assign various executory contracts and leases, including all of the agreements between ATP and Bluewater related to the Clipper Project.   On October 17, 2013, the Court approved, with modifications, the Asset Purchase Agreement ("APA"). (Case No. 12-36187, ECF No. 2706).  Pursuant to the APA and Final Sale Order, ATP sold to Bennu ATP's interest in the Clipper Project to Bennu.

## Effect of Bennu Assumption

Bennu has stepped into ATP's shoes with regard to the ARMSA and Work Order II, and it is bound by those agreements to the same extent that ATP was bound by them prior to its assignment to Bennu.  "An executory contract … must be assumed in its entirety. A debtor may not pick and choose those portions that it wishes to enforce and reject those that it does not deem desirable. That is black letter law engraved in stone." *In re Diamond Head Emporium, Inc.*, 69 B.R. 487, 494 (Bankr. D. Hawaii 1987) (citations omitted). Accordingly, Bennu, as ATP's assignee, is bound by all provisions of the contracts (*e.g.*, the ARMSA and Work Order II) that ATP assigned to it.

## Bennu's Claims Against Bluewater

In its complaint, Bennu alleges that after the oil well located at the Clipper Project began producing, "the Umbilical lost electrical connectivity." (ECF No. 1 at 11-12).  Bennu claims that the umbilical is defective, not repairable, and needs to be replaced.  (*Id*. at 11-12).  Bennu has asserted claims for breach of contract and breach of warranty against Bluewater.  (ECF No. 1).

For its breach of contract claim, Bennu seeks three broad categories of damages:

(a) expenses and damages associated with delay and increased cost of the Clipper Project that were a result of BWI's breaches of the BWI Agreements, (b) expenses and damage suffered as the result of the failed Umbilical, including, but not limited to (i) the costs to position a ship to provide a secondary umbilical, (ii)

remediation expenses, which are expected to total in excess of $13 million, for manufacture and installation of a new, functional and defect-free umbilical at the Clipper Project and (iii) lost revenue as the result of the failed Umbilical; (c) expenses and damage suffered by Bennu as the result of liens placed on the Clipper Project by BWI or its subcontractors, including the cost to defend against such liens and/or satisfy the liens of subcontractors (including, but not limited to, the costs associated with this lawsuit).

(ECF No. 1 at 16-17).

The two categories of damages relevant to Bluewater's summary judgment motion include (a) damages associated with the delay and increased cost of the Clipper Project and (b) damages relating to the failed umbilical.

For its breach of warranty claim, Bennu only seeks damages relating to the failed umbilical.  The three subcategories of damages relating to the failed umbilical include:

(i) expenses to position a ship and associated equipment and personnel at the Clipper Project to provide a secondary umbilical, (ii) remediation expenses expected to total in excess of $13 million for manufacture and installation of a new, defect-free umbilical at the Clipper Project, and (iii) lost revenue as a result of the failed Umbilical.

(ECF No. 1 at 17).

### Bluewater's Motion for Summary Judgment

Bluewater requests that the Court "grant summary judgment and order that Bennu may not seek at trial any "consequential, special or indirect" damages relating to Bluewater's Work, including (i) damages associated with alleged delays in completing the Work or increased costs of the Clipper Project; (ii) lost revenue; or (iii) expenses associated with Bennu's positioning of the Secondary Umbilical." (ECF No. 47-1 at 8).

Bennu concedes that "If Bennu cannot show gross negligence, willful misconduct, or intentional acts, then the ARMSA does prevent the recovery of consequential, special or indirect damages." (ECF No. 59).   Bennu raises two arguments as to why the Court should deny

Bluewater's motion: (i) summary judgment is premature because Bennu should be allowed to conduct discovery to determine whether Bluewater's gross negligence resulted in the umbilical's failure; and (ii) properly characterizing damages as direct or consequential is a question of fact to be determined at trial.

### Louisiana Law

The Outer Continental Shelf Lands Act ("OCSLA") applies Louisiana law (as surrogate federal law) to the extent that it is "not inconsistent with this Act [OCSLA] or with other Federal laws." 43 U.S.C. § 1333(a)(2)(A). No inconsistency has been shown. Accordingly, Louisiana law applies to this dispute.

The Court has identified three issues related to Bluewater's motion for summary judgment: (i) whether Bennu successfully plead a claim for gross negligence, (ii) whether the consequential damages waiver provision is enforceable, and (iii) whether to characterize each of the four categories of damages as direct or consequential. There is Louisiana statutory law or case law that addresses issues (i) and (ii). For issue (iii), there is Louisiana statutory law to guide the Court in characterizing the two categories of damages that are expressly included in the definition of consequential damages in the parties' agreement. However, there is no Louisiana statute or case law that directly addresses how to characterize the two categories of damages that are not mentioned in the agreement. Accordingly, the Court must provide an "*Erie* guess" as to how the Louisiana Supreme Court would characterize those two categories of damages. *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court must make an Erie guess and determine as best it can what the Louisiana Supreme Court would decide.") (internal citations omitted).

**Failure to Plead "Gross Negligence, Willful Misconduct, or Intentional Acts"**

The ARMSA expressly precludes recovery of "consequential, special or indirect damages," except those which result from "gross negligence, willful misconduct or an intentional act" or "out of or in connection with pollution…" (ECF No. 47 at 23).

Bennu has failed to plead that the allegedly "defective" umbilical is the result of any gross negligence, willful misconduct or intentional act by Bluewater. Nor does Bennu allege that its purported damages arise out of or in connection with pollution. Accordingly, Bennu has failed to plead a theory of recovery that would entitle them to "consequential, special or indirect damages."

It is well settled that a plaintiff is not "permitted to rely on an unpled theory of recovery to defeat summary judgment." *Allstate Ins. Co. v. Palmbeck*, 2012 WL 2130982, at *3 (N.D. Tex. 2012) (refusing to consider a theory of recovery raised by counterclaimant in opposition to summary judgment). "[T]heories of liability must be pled in the Complaint." *Miller v. Monaghan*, 2008 WL 821928, at *2 (N.D. Miss. 2008) (quoting *De La Hoya v. Coldwell Banker Mex., Inc.*, 125 Fed. Appx. 533, 536 (5th Cir. 2005)). "Therefore, only those claims made known in Plaintiff's complaint are viable in this case, and only those theories of recovery will be addressed here [in deciding summary judgment]." *Id.*

Bennu has only plead claims for breach of contract and breach of warranty in its complaint. The ARMSA specifically lists these causes of actions as examples of when the parties cannot recover consequential damages. (ECF No. 47-3 at 23) (stating that the parties cannot recover consequential, special, or indirect damages "…whether based on negligence, unseaworthiness, ***breach of warranty, breach of contract,*** strict liability or other.") (emphasis added).

Bennu argues that the Court can "reasonably infer from the allegations of the Original Complaint that the Umbilical failure may have resulted from more than negligent conduct." (Case No. 14-3001 ECF No. 59 at 3).  The Court rejects this argument.

The words "gross negligence" are not mentioned in the complaint, much less a sufficiently plead claim for gross negligence.  The Court will not infer a gross negligence claim just because Bennu's breach of contract and breach of warranty claims include allegations that Bluewater engaged in *negligent* conduct.  A claim for "gross negligence" is a separate theory of recovery than a claim for ordinary negligence.  Indeed, the parties carved out an exception in the ARMSA that would allow the parties to recover consequential damages for gross negligence, while precluding consequential damages for ordinary negligence.

Accordingly, Bennu cannot recover "consequential, special or indirect damages" for its breach of contract and breach of warranty claims under its currently filed complaint.

### Waiver of Consequential Damages

"For a waiver of recoverable damages to be effective, as with the waiver of warranties, it must be 1) written in clear and unambiguous terms; 2) contained in the contract; 3) brought to the attention of the parties against whom it is to be enforced." *Gulf Am. Indus. v. Airco Indus. Gases*, 573 So. 2d 481, 489 (La. Ct. App. 1990) (citing *Fontenot v. F. Hollier & Sons,* 478 So. 2d 1379 (La. Ct. App. 1985).  Bennu admits that the ARMSA unambiguously waives the parties' rights to seek consequential, special or indirect damages for any reason other than one of the exceptions listed.  (*See* ECF No. 59 at 1) ("Bennu does not dispute that by the plain terms of the Amended and Restated Master Service Agreement (the "ARMSA"), the parties waived their rights to seek "consequential, special or indirect damages" except those that result from "gross

negligence, willful misconduct or intentional act[s]" of the parties."). Moreover, Bennu does not dispute that the waiver was brought to its attention prior to entering into the agreement.

Nor does the provision violate the Louisiana Civil Code because it states that the waiver does not apply to claims for gross negligence, willful misconduct, or intentional acts. La. Civ. Code Ann. art. 2004 ("Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party."). Accordingly, the waiver provision is enforceable.

### Characterizing Categories of Damages

Bluewater seeks summary judgment on four categories[1] of damages: (i) lost revenues, (ii) damages associated with alleged delays in completing the Work ("production delays"), (iii) increased costs of the Clipper Project; and (iv) expenses associated with Bennu's positioning of the vessel to provide the secondary umbilical. In the ARMSA, it states that "consequential damages shall include, but not be limited to, loss of revenue, profit or use of capital, production delays, loss of product, reservoir loss or damage, losses resulting from failure to meet other contractual commitments or deadlines and downtime of facilities or vessels…" (ECF No. 1-3 at 23). The ARMSA does not preclude Bennu from recovering *direct* damages, but the agreement does not define the term direct damages. Accordingly, the Court must determine if each category of damages is direct or consequential.

The Court finds that categories (i) and (ii) are consequential as a matter of law, category (iv) is direct as a matter of law, and that there is a genuine issue of material fact as to whether category (iii) is direct or consequential. Accordingly, with regards to Bennu's currently plead

---

[1] Although Bluewater's motion for summary judgment lists three categories of damages, the Court considers the category for "damages associated with alleged delays in completing the Work or increased costs of the Clipper Projects" in separate categories.

breach of contract and breach of warranty claims, the Court grants summary judgment as to categories (i), (ii), and denies summary judgment as to categories (iii) and (iv).

**Damages Included in the Definition of "Consequential Damages" in the ARMSA**

Categories (i) and (ii) are expressly included in the definition of consequential damages. Most courts agree that when the parties expressly define a category of damages as consequential, then they will be deemed consequential as a matter of law.  *See, e.g., McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.,* 63 F.3d 1188, 1195 (2d Cir. 1995); *see also Roneker v. Kenworth Truck Co.*, 977 F. Supp. 237, 239-40 (W.D.N.Y. 1997) (stating that "where the parties have gone a long way in defining the scope of consequential damages in the contract itself… the court may find, as a matter of law, that the damages sought by the [plaintiff]... constitute consequential damages, rather than direct damages.") (internal citations omitted).

The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046.  The ARMSA includes a definition of "consequential damages" and provides a non-exhaustive list of damages that are deemed consequential.  It defines "consequential damages" as including, but not being limited to, "loss of revenue, profit or use of capital, production delays..." (ECF No. 47-3 at 23).   The agreement unambiguously defines consequential damages to include loss of revenue and damages relating to production delays.

### (i)  Lost Revenue

For its breach of warranty and breach of contract claims, Bennu seeks damages for lost revenues resulting from the failed umbilical.

"Lost profits may be in the form of direct damages, that is, profits lost on the contract itself, or in the form of consequential damages, such as profits lost on other contracts or relationships resulting from the breach." *A-Delta Overnight Legal Reprod. Servs. Corp. v. David W. Elrod,* 2012 WL 5351265 (Tex. App. 2012).   In this case, Bennu seeks damages for the revenues it would have received from production had the umbilical worked properly.   The alleged lost revenues therefore relate to other contracts.   Accordingly, this category of damages constitutes consequential damages.

Damages for lost revenue fall within the express definition of "consequential damages" set forth in the ARMSA.   (ECF No. 47-3 at 23).   Bennu concedes that lost profits are not recoverable in the absence of "gross negligence, willful misconduct, or intentional acts." (ECF No. 59 at 4).   Accordingly, Bluewater's motion for summary judgment is granted as to Bennu's attempt to recover damages for lost revenue on its breach of contract and breach of warranty claims.

**(ii) Production Delays**

For its breach of contract claim, Bennu seeks "expenses and damages associated with delay."   The ARMSA defines consequential damages as including damages associated with "production delays" and "losses resulting from…deadlines or downtime of facilities or vessels." This language unambiguously waives damages related to production delays.   Accordingly, Bluewater's motion for summary judgment is granted to the extent that Bennu seeks damages related to production delays on its breach of contract claim.

### Proper Characterization of Remaining Categories

The remaining two categories of damages (the increased costs of the Clipper Project and the costs associated with positioning a ship to provide a secondary umbilical) are not included as

examples of consequential damages in the ARMSA. Without offering any explanation, Bluewater asserts that "[i]t seems beyond doubt that such damages constitute consequential, special, or indirect damages and thus are not recoverable by Bennu here." (ECF No. 60 at 5).

The first question is whether, at the summary judgment level, the Court can properly characterize these categories of damages. Bennu cites to several cases, from various jurisdictions, in support of its argument that properly characterizing these damages as direct or consequential is a question of fact not appropriate for resolution now. *See, e.g.*, *Farrell Constr. Co. v. Jefferson Parish, La.*, 86-4242, 1992 WL 210027 (E.D. La. Aug. 20, 1992); *Hycel, Inc, v. Am. Airlines, Inc.*, 328 F. Supp. 190, 194 (S.D. Tex. 1971) (equating consequential to special damages, holding that "what amounts to special damages is largely dependent on the circumstances of each case . . . and is essentially a question of fact."); *Roneker v. Kenworth Truck Co.*, 977 F. Supp. 237, 239 (W.D.N.Y. 1997) ("as a general matter the precise demarcation between direct and consequential damages is a question of fact…") (internal citations omitted). However, none of the cases cited by Bennu supports the blanket proposition that the proper characterization of all categories of damages is necessarily a question of fact that cannot be decided on summary judgment.

*Farrell Constr. Co*. is the sole Louisiana case that Bennu cites to support its claim that the Court cannot resolve the issue of how to characterize these damages until trial.   *See Farrell Constr. Co. v. Jefferson Parish, La.*, 86-4242, 1992 WL 210027 (E.D. La. Aug. 20, 1992). However, the court merely stated that there were unresolved factual issues that prevented the court from properly characterizing the damages. *See Farrell Constr. Co. v. Jefferson Parish, La.*, 1992 WL 210027 (E.D. La. Aug. 20, 1992).  The Court does not interpret *Farrell Constr. Co.* to

mean that the characterization issue is necessarily a question of fact that cannot be determined at summary judgment.

### *Erie* Guess

This Court is unaware of any Louisiana statute or case that articulates a standard for determining whether a certain category of damages is direct or consequential when the parties' agreement does not enumerate that category as either consequential or direct.

In a case dating back to 1851, the Louisiana Supreme Court mentions the difference between consequential and direct damages, and appears to adopt a broad definition of direct damages. In that case, a buyer sued a seller for breach of contract when the seller failed to deliver a suitable crank for the buyer's steamboat. As a result of seller's breach, buyer's boat was detained. In dicta, the Court stated that the buyer's costs related to detention of the boat constituted direct damages. *Cable v. Leeds*, 6 La. Ann. 293, 293 (1851) ("These damages were caused directly by the defendants by making a crank that could not be used, and they are therefore responsible for them. Greater *direct damages* are claimed, but not proved.").

However, this decision provides little guidance because the Court did not consider the characterization issue in the context of when the parties waive rights to recover consequential damages, but not direct. Nor has the Louisiana Supreme Court considered whether the two categories of damages at issue in this case constitute direct or consequential damages in any other context.

Accordingly, the Court must predict, to the best of its ability, what the Louisiana Supreme Court would decide under the same circumstances. *See Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 2014 WL 3573618 (5th Cir. 2014) ("The Texas Supreme Court has not considered whether several fraudulently indorsed and deposited checks constitute a

single injury or multiple injuries. So, we must determine, to the best of our ability, what it would decide under the same circumstances. In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise.") (internal citations omitted).

The Court has reviewed Louisiana appellate and district court decisions for guidance on the characterization issue.  Due to the limited Louisiana case law on point, the Court primarily relied on (i) Williston on Contracts, a secondary source commonly cited by the Louisiana Supreme Court, and (ii) Texas law in making its *Erie* guess.  *See Stanley v. Trinchard*, 500 F.3d 411, 423-24 (5th Cir. 2007) ("As no Louisiana case is directly on point, we must make an "*Erie*-guess" and predict how a Louisiana court would rule. In doing so, we may consult a variety of sources, including the general rule on the issue, and the rules in other states.").

**Louisiana Appellate Court Decision**

The Court found one Louisiana Appellate Court to deal with the characterization issue when the parties agreed to waive consequential damages.  In *S. Hardware Co.,* the Court characterized a buyer's damages incurred "due to failure or delay" in seller's delivery of a computer system as direct damages. *See S. Hardware Co. v. Honeywell Info. Sys., Inc.*, 373 So. 2d 738, 741 (La. Ct. App. 1979) ("…we find the damages actually sought by this petition are *direct damages* due to the Failure or Delay in performance by defendant.").  In that case, the appellate court made its decision based on its interpretation of the parties' contract.  The court believed that the language in the agreement treated "delay or failure damages" separately from "indirect, special, or consequential" damages.  *Id*.  Based on the court's reading of the agreement, the parties considered "delay or failure damages" to be recoverable direct damages.

Accordingly, the *S. Hardware Co.* decision is only helpful insofar as indicating that the Court should try to ascertain whether the parties intended to characterize these categories of damages as direct or consequential.  Unfortunately, the parties' intent is unclear because these two categories of damages are not included as examples of damages under the definition of consequential.  These categories of damages are not mentioned in the waiver provision.  Nor is it fair to infer that exclusion of these damages in the definition necessarily means that the parties didn't consider them to be consequential.  The definition of consequential damages provides a non-exhaustive list of examples.  However, the fact that neither of these categories fall under any of the seven listed examples of consequential damages lends some support to the argument that the parties did not consider them to be consequential.

**Williston on Contracts**

The Louisiana Supreme Court commonly cites to Williston on Contracts.  *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055 (La. 3/19/13); 112 So. 3d 187, 196 (*citing* 11 Williston on Contracts § 32:13 (4th ed.)).  Accordingly, this Court looks to Williston's definition of direct (or general) and consequential damages for guidance:

> General damages are considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events. Such damages are said to be the proximate result of a breach, and are sometimes called *"loss of bargain"* damages, because they reflect a failure on the part of the defendant to live up to the bargain it made, or a failure of the promised performance itself. Consequential damages, on the other hand, include those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach.

24 Williston on Contracts § 64:12 (4th ed.) (emphasis added).

**Other Jurisdictions**

With little guidance from Louisiana courts, the Court will consider approaches taken by other jurisdictions.  Many courts have found that the distinction between direct and consequential has to do with the degree to which the damages are foreseeable. *See, e.g., Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.,* 286 F.3d 1001, 1004 (7th Cir. 2002) (stating that common law "distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach.").

Although most courts adhere to the same general principles of distinguishing direct and consequential damages, courts vary considerably on how they apply these principles to characterize certain categories of damages.

The Texas Court of Appeals has issued two decisions that provide this Court with some guidance. *See Stanley v. Trinchard*, 500 F.3d 411, 424 (5th Cir. 2007) (where the Fifth Circuit looked to Texas law in making its *Erie* guess and concluding that a Louisiana court would adopt the same rule as the one adopted by the Texas Supreme Court).  In *Tennessee Gas Pipeline Co.,* a Texas Court of Appeals dealt with the issue of distinguishing between direct and consequential damages under similar circumstances. *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, 2008 WL 3876141 (Tex. App. 2008).  In that case, Tennessee Gas Pipeline Company ("TGP") hired Technip USA to construct improvements along an interstate gas pipeline owned by TGP.  The parties agreement contained a nearly identical waiver of consequential damages that included a non-exhaustive list of damages that the parties enumerated as "consequential:"

> *Consequential Damages:* Notwithstanding any other provisions of this Agreement to the contrary, in no event shall Owner or Contractor be liable to each other for any **indirect, special, incidental or consequential loss or damage including, but not limited to**, loss of profits or revenue, loss of opportunity or use incurred by either Party to the other, or like items of loss or damage; and each Party hereby releases the other Party therefrom.

*Id.*

After project delays occurred, TGP sued Technip to recover its additional expenses and for allegedly defective work.  The jury awarded damages to TGP for several different categories of damages.  The Texas Court of Appeals considered which of these categories were direct or consequential.  The Court held that damages for (i) project delay costs (which were not listed as an example of consequential damages like in the Bennu-Bluewater agreement) and (ii) damages related to providing power were *direct damages.*  The Court reasoned that these types of costs were conclusively presumed to be foreseen by Technip because these costs were discussed in the parties' agreement. (*Id.*) ("Because TGP [was] expressly responsible for these costs under the Contract, it can be conclusively presumed to have been foreseen or contemplated by Technip that, as a consequence of its breach of the Contract by delay, TGP would have to continue paying these ongoing costs.").

The Court held that the remaining categories of damages, such as loss of efficiency (i.e. excess gas, oil, and labor), the cost of renting a backup generator, interest that accrued on the amount that TGP invested in the project, and premature energy costs were *consequential* damages that were precluded by the terms of the contract.  The Court reasoned that these damages were "too remote to be conclusively presumed to have been foreseen or contemplated by Technip USA as a consequence of its breach." *Id.*

In *Powell*, the Texas Court of Appeals held that the costs associated with repairing a transformer that failed due to the defendant's breach of contractual and warranty obligations, were direct damages.  *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 119 (Tex. App. 2011).  However, the Court concluded that Plaintiff's costs relating to the operation of a

temporary transformer were consequential rather than direct damages.  *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex. App. 2011).

### (iii)Increased Costs of the Clipper Project

In its response, Bennu makes a distinction between "delayed production" costs (included as consequential under the ARMSA) and the "increased costs of construction."  (ECF No. 59 at 6).  In its complaint, Bennu describes the increased costs of the Clipper Project as follows:

> As of August 28, 2012 - shortly after the Debtor's bankruptcy filing - the Debtor projected the cost to complete the Clipper Project to be approximately $120 million. Although still being fully determined, taking into consideration the total amount of the asserted claims by BWI and Technip, the total cost of the Clipper Project would be in excess of $200 million **(not including amounts described below that are being incurred as a result of the failed Umbilical).**

(ECF No. 1 at 11).

Accordingly, Bennu appears to be seeking $80,000,000.00 in damages that may not be directly linked to the failed umbilical. It is unclear whether the "increased costs of construction" are entirely attributable to "delayed production" costs. To the extent that these damages relate to delayed production costs, these damages are consequential as a matter of law.

However, a portion of these increased costs may have been incurred as a result of Bluewater's alleged "failure to adequately provide project management, coordination and inspection services to the Clipper Project as required in the BWI Agreements" or its "failure to submit Change Orders for approval by ATP covering additional costs and other charges that BWI is seeking to recover." (ECF No. 1 at 16).

Increased costs incurred as a consequence of a breach are generally considered consequential damages. *See e.g.*, *Roneker v. Kenworth Truck Co.*, 977 F. Supp. 237, 239-40 (W.D.N.Y. 1997) ("It is well-accepted that any items of increased costs incurred as a consequence of the breach will be considered as consequential damages." *Roneker v. Kenworth*

*Truck Co.*, 977 F. Supp. 237, 239-40 (W.D.N.Y. 1997).  However, in *Tennessee Gas Pipeline*, the Texas Appellate Court held that when certain costs are contemplated by the parties, evidenced by discussion of such costs in the contract, an increase in those costs may constitute direct damages.

Without knowing more about the nature and cause of the increased costs, the Court will not conclude that they are consequential as a matter of law.  Direct damages are often referred to as "loss of bargain damages" because they reflect a failure on the part of the defendant to live up to the bargain it made.  If the alleged increased costs incurred by Bennu relate to costs that Bluewater was contractually responsible for monitoring, then these might constitute "loss of bargain damages."

Paragraph 1 of the Work Order states that the "Contractor [Bluewater] agrees to diligently perform and complete all work and furnish all equipment, vessels, tools, materials, supplies and personnel necessary and incidental to the following work activities," which includes, for example, "Offshore hook up and Commissioning."  (ECF No. 1-4 at 1).  Paragraph 3 of the Work Order, entitled "Cost Estimates & Preliminary Authorization," includes costs estimates for various jobs that Bluewater was responsible for completing on the Clipper Project. (ECF No. 1-4 at 2).  This paragraph indicates that ATP and Bluewater contemplated an estimate cost of $3,388,475.00 on "Offshore Hook-up and Commissioning."  *Id*.

If, for example, Bennu's alleged increased costs were the result of Bluewater's failure to properly monitor the costs involved in performing its "Offshore Hook-up and Commissioning" work, then this may constitute direct damages.  These damages would be a part of Bennu's expectation interest from the contract. *See Daimler Chrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App. 2012) (explaining that "[o]ne measure of the direct damages is the

"benefit of the bargain" measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.").

A portion of this category of damages may relate to costs that Bluewater was obligated to monitor or may be the result of a breach of Bluewater's warranty to work diligently. Accordingly, there is a genuine issue of material fact as to whether these damages are direct or consequential.  Bluewater's motion for summary judgment is denied as to Bennu's attempt to recover damages for the increased costs of construction on its breach of contract and breach of warranty claims.

**(iv) Bennu's Positioning of the Vessel to Provide a Secondary Umbilical**

Bennu seeks damages for expenses associated with the positioning of a vessel to provide the secondary umbilical.  The Court finds that these damages are direct.

These damages are particular to Bluewater's alleged failure to provide and install a properly functioning umbilical.  Bennu claims that:

> As a direct result of the failed Umbilical, ATP originally, and now Bennu, maintained a vessel and associated equipment and personnel at the Clipper well site with a secondary umbilical attached to the well at a cost of greater than $100,000 per day. Bennu was required to maintain such vessel and its associated equipment and personnel at the Clipper Project in order to operate the Clipper Gas Well in accordance with applicable laws until the defective Umbilical can be repaired and/or replaced.

(ECF No. 1 at 12).

Bluewater does not contend that Bluewater's estimated $13,000,000.00 cost to replace the defective umbilical is a consequential damage.  This is likely because replacement damages were not included as an example of consequential damages in the agreement.  Providing and installing the umbilical was a substantial component of Bluewater's obligations under the

agreement.  It is hard to imagine that these sophisticated parties did not contemplate the cost of replacing the umbilical in the event that the umbilical was damaged or defective.

This is consistent with the general rule that repair or replacement costs of defective equipment constitute direct damages. *See, e.g., Wright Schuchart, Inc. v. Cooper Indus., Inc.*, 40 F.3d 1247 (9th Cir. 1994) (finding that "any costs it incurred by *directly* contributing to the repair of defective Cooper or Magnetek equipment are recoverable as direct damages."); *see also 21st Century Props. Co. v. Carpenter Insulation & Coatings Co.,* 694 F.Supp. 148, 152 n. 2 (D. Md. 1988) (stating, in breach of warranty case under Maryland law against building contractor for installation of faulty roofs, "the cost of replacing the allegedly defective roofs which plaintiffs seek to recover constitutes the direct damage, not incidental or consequential damages, caused by the wrongs alleged.").

Bennu argues that "[a]s a form of temporary replacement, the costs incurred in positioning the vessel are akin to the costs Bennu has incurred to replace the Umbilical."  (ECF No. 59 at 5-6).  This category is better characterized as replacement damages than any of the listed examples of consequential damages.

As mentioned above, in *Powell*, the Texas Court of Appeals held that costs associated with repairing a transformer were direct and that costs relating to the operation of a temporary transformer were consequential.  *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 119 (Tex. App. 2011).  The Court reasoned that although Plaintiff's power substation was designed to run on a two-transformer system, the evidence demonstrated that it could run with only one transformer and that in fact the substation's ability to run on one transformer was a necessary part of Defendant's performance under the contract. *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex. App. 2011).  Accordingly, the Court held that they

could not conclude that the parties may be "conclusively presumed to have foreseen" that defendant's breach would necessitate the use of a temporary transformer.  In the event that one transformer failed to work, the parties contemplated that the substation would operate fine with the other transformer.

This case is different from *Powell* because the parties' agreement demonstrates that (i) providing and installing the umbilical was a substantial component of Bluewater's obligations; (ii) that both parties contemplated that the umbilical was necessary to complete the Clipper Project; and (iii) Bluewater warranted that "[a]ny and all defective or unsuitable Equipment of Goods shall be removed, replaced or corrected, as applicable by [Bluewater] without additional cost or risk to [ATP]." (ECF No. 1-3 at 6).

Bennu alleges that because Bluewater has refused to honor its contractual warranties by repairing and/or replacing the defective umbilical, Bennu has been forced to incur expenses to operate a temporary umbilical.  (ECF No. 1 at 12-13).  These are costs that Bennu was forced to incur due to Bluewater's alleged failure to fulfill its contractual warranty to repair and or replace defective equipment.  Accordingly, these damages relate to Bennu's expectation interest and therefore constitute direct damages.  Bluewater's motion for summary judgment is denied as to Bennu's alleged damages associated with positioning a vessel on its breach of contract and breach of warranty claims.

### Conclusion

The Court will enter an Order consistent with this Memorandum Opinion.

SIGNED **September 18, 2014.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE